www.azoogle.com Next case is Associate, Inc. v. Azoogle, Epic and Social Assets, 2013-14-46, Mr. Newman Good morning, Your Honors, and may it please the Court, I'd like to discuss two issues. The first is the District Court erred by disregarding evidence that Epic correlated a target Webmaster Identification Code, or TWID, by practicing the hybrid string technique disclosed in the patent. The second issue that I plan to discuss is that the District Court erred by excluding testimony from Michael Landau about his firsthand experience using and working with certain existing merchant affiliate systems, and that he could recognize the syntax of a URL functional in those systems. I'll start with my first point. Will your case fall if, on the issue of summary judgment, if we affirm on the issue of the exclusion of the expert report Mr. Landau's opinion? Is Your Honor asking whether, if the Court was correct, that it was expert as opposed to layman opinion, would our case fall? Is that the question, Your Honor? If the Court was correct in rejecting, excluding the declaration. As being expert testimony as opposed to layman testimony? Correct. No, Your Honor. And I'll address it in two ways. First, I will point out that there was other evidence that showed that Epic, the source system, had transmitted a URL to the target system, the existing merchant affiliate system, that included the TWID. You can find that in the Advertiser Implementation Guide where Epic discloses in the Advertiser Implementation Guide that it will pass along a code functional in the merchant system. And what that is specifically is my first point. Namely, that's the hybrid string technique, which is found in the patent on the record page 49. It's column 11, lines 15 to 20. The hybrid string technique discusses how a TWID can be transmitted through a URL generated with two portions. Portion number one identifies the source system itself. Portion number two identifies the source webmaster identifier, in other words, the SID. And Epic admitted that it transmitted URLs containing both the portion that identified Epic and the portion identifying the SID. Accordingly, the district court erred by ignoring that evidence because essentially Epic admitted transmitting a SID and its own identifier of itself, which would be a TWID. Now, the only question then is, considering that Epic admitted it, did it transmit a URL, generate a URL, containing this hybrid string with respect to the examples that the associate raised? That would be speeddate.com, Eyeballers, and As Seen on PC. And the answer to that question, did it, is yes. We know this because Epic submitted a document called the Offer URLs Table. And in the Offer URLs Table, the court could find all of the URLs that Epic used to generate codes. And there, you'll see Eyeballers, As Seen on PC, and speeddate.com, and you'll see codes that have both the identifier for Epic itself and the SID. And when the district court disregarded that, the district court disregarded evidence from which a jury could reasonably infer that a TWID was transmitted, it had been correlated from a SID because it was converted from a mere SID to a URL generated with the two ports being the hybrid string, and that the infringement occurred. The second point that I wanted to discuss is the one that Your Honor asked me about, and that's specifically the declaration of Michael Landau. The court excluded that, saying that it was expert testimony, not layman testimony. But what Mr. Landau testified about was his firsthand knowledge. He, at Associate, had worked with these existing merchant affiliate systems. And in fact, nobody disputes that Speeddate, for example, had an existing merchant affiliate system. The only question was, did Epic work with it? Well, Associate did, and Michael Landau testified about that. It's like him testifying, I saw a red car. He said, I worked with the affiliate system. And when I did, I used a particular URL syntax that Speeddate.com, Eyeballers, and As Seen on PC required us to use. But did he go on and also testify, I saw a red car, and that red car infringed? No, Your Honor, he did not. And a placido would know the following. I mean, it seems to me that part of his language in the declaration was couched in the very language that an expert would use, especially in addressing the expert opinion on the counter of the other expert's opinion. Your Honor, I think the court might be referring to the declaration of George Edwards and not Michael Landau. Michael Landau testified that at Associate, they worked with certain merchant affiliate systems that required a URL with a given syntax. And the lower court, and specifically the jury, could compare that URL and that syntax with the URL and syntax that Epic admitted it used with respect to the same merchants. And by comparing the two, a reasonable jury could see there's the code assigned to Associate with respect to Landau's testimony, there's the same code that's assigned to Epic with respect to Epic's testimony, and there's the SID for Associate, and there's the SID for Epic. That's the hybrid string. That is infringement. So Mr. Landau testifies, I saw a red car, and then Epic testifies, I too saw a red car. The jury can look at the two and note they are the same. And so Mr. Landau never rendered an opinion that there was infringement. He merely testified that at Associate, he engaged in certain practices, and the jury will infer, based upon Epic's testimony, that it engaged in the same practice. And from that, draw a reasonable inference. Namely, that a URL was generated containing a twig, and thus there was infringement. And so when the lower court analyzed the Landau declaration, it improperly excluded testimony because Landau wasn't forming an opinion. The main difference between an expert and a layman is an expert could look at something that he's never seen before, never experienced, and based upon scientific knowledge. So look at 1885, and let's look at this is a declaration of Mr. Landau, line 46. It starts off that one of ordinary skill in the art would not recognize the scripting platforms. Now that's not a declaration based on personal observation. That's based on a legal construct. And when I look through here, he's 44. He says, I testify, generally speaking, the correlation step was a crucial difference, but there's many differences exist, and the issue of the legal significance associated with the differences. So it seems like he does use language that an expert uses, and this is couched in expert lexicon. Your Honor is correct, but that's because he was qualified as an expert with respect to invalidity. And the testimony that's at issue here, and the testimony that the court relied on, wasn't paragraph 44, 45, or 46 that Judge Raina cites, but rather it was other testimony, namely the URL identification where Mr. Landau testified that there were certain URLs and syntax used with respect to those URLs that the associate was required to engage. Well, is part of the problem then that the declaration is partly expert and partly not? Yes, Your Honor. I suppose that's confusing. There were two issues. Well, whose burden, assume that's because I'm, and you're colloquy with Judge Raina, that's sort of what I heard you saying was, oh, yes, parts of the declaration certainly smack of an expert, with validity you said, but other parts not. Whose burden is it to point out particularly to the district court what pieces of the declaration should survive? I didn't see any of that having happened below. Your Honor, I'm not aware of a standard that requires a party submitting a declaration to note this part is layman testimony and this part is expert testimony. So, Judge Raina referred me to... What I'm saying is I didn't, maybe I missed it, but I didn't see a motion to eliminate everything to that effect to say, hey, Judge Crabb, you got it partly right, partly right. This is untimely with respect to the aspects of the declaration that go to validity, so we don't object to your chucking that out, but you got to get out your scissors and cut and paste and keep the other part. I just didn't see that argument being made to her. Well, there wouldn't be a motion to eliminate because it wasn't being filed. Well, there'd be a something, right? There was an exclusion? No, this wasn't for trial. This is for summary judgment. And, in fact, that argument hadn't even been raised by EPIC. The court reached that conclusion on its own. There was no oral argument. Well, it's looking at a declaration with mixed opinion. So my next question to you is why didn't you submit this mixed opinion before the deadline for the submission of expert reports? Your Honor, I'm not referring to the validity testimony. I'm referring to the firsthand fact testimony, which was not inconsistent with the deposition of Michael Landau. So, for example, in paragraph 107, Michael Landau testifies about the URL that, as seen on PC, instructed the associate to use. So, in this declaration, Mr. Landau provides foundation for his role as associate and what he did and how he used existing merchant affiliate systems, such as as seen on PC. And in paragraph 107, Mr. Landau testifies about the syntax of that URL. Now, if the court looks at EPIC's URL table, they will see that same URL syntax for as seen on PC. Mr. Landau testifies as to that it was functional in the merchant system. A reasonable jury could conclude that EPIC's is as well. And so I'll reserve my remaining time for rebuttal. Thank you, Your Honors. We will keep it for you, Mr. Newman. Ms. Gregor. Good morning. May it please the Court. There were three parts to the district court's decision on non-infringement. Three elements of the 60 patent claims that the district court found missing in the EPIC direct system. An associate here has only appealed two of the three reasons for non-infringement. In the district court... You mean he's only argued two today or only two in his brief? Only two in the brief. The three issues that formed Judge Crabb's decision on non-infringement consist of the following three elements that she determined to be missing after you compare the 660 patent claims to the EPIC system. The first is that she held that to infringe the 660 patent, it was required to provide virtual affiliates to a target merchant affiliate system. The second was that she held that the EPIC direct system did not perform the configuring step. And third, she held that the EPIC system did not perform the correlating step. But E-associate has not appealed the first of those here on virtual affiliates. And all we need is one reason, one missing limitation for a finding of non-infringement and this court can affirm for that reason alone. I'd like to turn over to comment on counsel's argument about the Landau Declaration. And to use his analogy, I saw a red car. That Landau's declaration is akin to Landau testifying that he saw a red car. In this case, a more apt analogy would be that Landau is testifying that he saw a red car but he was standing on the wrong intersection. In this case, the district court properly excluded the Landau Declaration. It was chock full of expert testimony and it was three months after the district court's deadline for expert disclosures. What's your response to your opponent's argument that the declaration was mixed and personal observations or late testimony but it also had some technical and scientific testimony and that the court should have figured this out? Well, Judge Crabb actually gave two reasons for excluding the Landau Declaration. One was that it was expert testimony. The second was that it lacked foundation, which it did. She was right on both counts. And what happened is this case was decided in the district court on summary judgment. In the Western District of Wisconsin, we have a procedure where the movement has to provide proposed findings of fact in a separate document from our brief. And the Landau Declaration actually follows very closely our proposed findings of fact. So there's a lot of stuff in the Landau Declaration. But the relevant parts to non-infringement are predominantly expert testimony to the extent they're not, they lack foundation. Michael Landau provided testimony in the Declaration about how E-Societ's system interacted with SpeedDate, the one example transaction that E-Societ bases its entire infringement case on. But that can't be construed and inference can't be drawn from E-Societ's interaction with SpeedDate to how the EPICS system interacted with SpeedDate. And E-Societ never identified in any place, in its opening brief or even in its reply brief, the paragraph of the Landau Declaration that it thinks are late testimony and should have been admitted. And E-Societ, I'll note, does not appeal or dispute the holding that if the Landau is expert testimony, it was late and should be excluded. And we didn't obviously have a chance to respond to E-Societ's reply brief. But after we argued in our brief that E-Societ never identified the paragraph, never parsed out what parts of the Landau Declaration it thinks should have been admitted as late testimony, E-Societ attempted to do it in its reply brief. But I urge the Court to look carefully at E-Societ's reply brief on page 1. I list some bullet points of testimony that they argue should have been admitted. The first bullet point, even, they say... What page is this? This is page 1 of the reply brief. Page 1 of the reply brief. The first bullet point, even, E-Societ says that there's evidence there relating to E-Societ's affiliate system, and it cites E-Societ's opening brief at page 21. But on page 21 of E-Societ's opening brief, there are no citations to the Landau Declaration. The only citations to the record on that page are to Judge Crabb's order and to the declaration or the excerpt report of George Edwards. And so, moving back to the district court... You're essentially saying to us that you believe that E-Societ failed to... that they stubbed their toe on the threshold requirement of an operating a virtual affiliate network?  So that was the first bullet point. That was the first reason for the district court's holding of non-infringement. And virtual affiliates... Because I'm probably going to ask on rebuttal, you're going to say they don't refer to this at all in their brief? They don't in any way, shape, or form contest this notion that they don't meet the threshold requirement of operating? The accused device doesn't? That's right. It's not in E-Societ's briefing. Sticking with virtual affiliates for a moment, the district court held that virtual affiliates are affiliates in one system that can send traffic to a different affiliate system. The district court held that that term is in the preamble and it's limiting. And she held that the EPIC direct system is not a virtual affiliate system. The EPIC system is a hub-style system, just like the LinkShare hub-style affiliate system described as prior art in the background section of the 660 patent. EPIC did not provide virtual affiliates or any other kind of affiliates to a merchant affiliate system. And so in the example transaction between EPIC and SpeedDate that E-Societ bases its case on, E-Societ argues that EPIC provided affiliates to SpeedDate, thus satisfying any following claim elements related to a target merchant affiliate system. But the uncontroverted evidence in this case actually shows that when SpeedDate was interacting with EPIC, SpeedDate was only interacting with EPIC as a merchant. EPIC's system was not sending traffic to SpeedDate's affiliate system. There's two pieces of evidence that show this, which are uncontroverted by Landau's declaration or anything else. The first is a SpeedDate insertion order, like an invoice between EPIC and SpeedDate, showing that the EPIC system used cookie and pixel tracking with respect to traffic sent to SpeedDate. The second piece of evidence are the domains themselves. When the E-Societ system interacted with SpeedDate, E-Societ sent traffic to a domain called affiliates.speeddate.com. But when EPIC sent traffic to SpeedDate, it used a different domain, mysdate.com. With respect to Judge Crabb's second reason for non-infringement, the configuring step, she got that right too, holding that the EPIC system did not perform the configuring step. The configuring step requires a configuration to allow the target merchant affiliate system to recognize the transaction as originating from a webmaster in a source system and requires assigning a SID. In Council's argument today, E-Societ said that EPIC admitted that it was transmitting a SID and a TWID on the URL. We never made any kind of admission like that. The reason that the EPIC system did not perform the configuring step is that when EPIC sent traffic to SpeedDate, it was only sending traffic to SpeedDate as a merchant, not to SpeedDate's affiliate system. Turning over to the third element at issue, the correlating step, EPIC did not perform that step either. And the reason that EPIC did not perform that step is because there was no TWID in the EPIC system on the URL that sent traffic to SpeedDate. Council for E-Societ talked today about a hybrid string method that's described in the patent for correlating a SID to a TWID. EPIC didn't do that. In the hybrid string method described in the patent, a TWID is created by combining characters representing a source system with the ID of the affiliate in the source system. So there's an example given in the patent. In the patent example, the TWID is CD1001. CD represents the source affiliate system, and 1001 is the affiliate ID. EPIC didn't do this. In the district court, the parties actually agreed on the construction of TWID, and it was construed to mean a unique identifying code assigned to Webmaster in the source affiliate pool that is functional in the target merchant affiliate system and that corresponds to the unique identification system of the target merchant affiliate system. There was no TWID. E-Societ identified a long string of characters that it calls the TWID in the example transaction starting with A equals 53 followed by a string of characters. That string is a combination of four variables. The only unique identifier in that string is just the affiliate ID. There was no correlated TWID. At bottom, E-Societ did not and cannot prove infringement in this case. A properly presented case would have taken an example transaction and traced through all the various participants in the transaction, providing evidence to use that. E-Societ in this case had no evidence from Speed Date, no evidence from any affiliate, and no evidence from EPIC that demonstrated infringement. This court should affirm the district court's position. The Speed Date doesn't direct you to an affiliate? I'm sorry. Is that what you were saying? Why was it that you said at one stage that the Speed Date didn't just direct you to Speed Date and not to anybody else? That's right. In the EPIC system, in the example transaction with Speed Date, EPIC directed affiliate traffic to Speed Date as a merchant or an advertiser, but EPIC did not send traffic to Speed Date's affiliate system. But when you click on Speed Date, it goes to sign up, action, join, and AFID. AFID is an affiliate ID. Is there... I don't know whether you clicked on affiliates.speeddate.com and mysdate.com to see what happened? Well, affiliates.speeddate.com was the domain that E-Societ sent traffic to. mysdate.com was the Speed Date domain that EPIC sent traffic to, and that was the final landing page. The process started with a jump link, which is embedded in a banner ad. From there, another URL was generated, and that sent traffic in the case of EPIC. They sent it to mysdate.com, which was just Speed Date. E-Societ, when it went through its process, sent traffic from an affiliate not enrolled in Speed Date's affiliate system to a different domain, to Speed Date's affiliate system. And if there are no further questions, I'll just wrap up by requesting that this court affirm the district court's decision in its entirety. Thank you, Ms. Gregoire. Mr. Newman has four minutes plus to reply. EPIC contends that E-Societ failed to argue that there were virtual affiliates sent to a target merchant affiliate system. The lower court found that the reason why E-Societ had failed to prove virtual affiliates is because it had failed to prove an existing merchant affiliate system. And earlier in argument, in our briefs, we discussed why there was evidence from which a jury could reasonably infer that there was an existing merchant affiliate system. And based upon that, the jury can conclude that the affiliates sent to it who weren't enrolled in it were virtual affiliates. In addition, Michael Landau testified that there were virtual affiliates provided to these merchants by E-Societ, and we know from the record in comparing URL strings that EPIC sent the same URL string to the same merchants. Thus, a jury could infer that there were virtual affiliate strings. EPIC also contends that E-Societ did not identify the lay testimony in Michael Landau's declaration, but E-Societ did. On page 37 of the opening brief, E-Societ cites to the record specifically A1890-91, A1898-99, and A1905-07. And specifically, the paragraphs in his declaration that contain lay testimony as opposed to expert testimony are paragraphs 99-114. In paragraphs 99-114, Mr. Landau testifies about his experience at E-Societ working with existing merchant affiliate systems and the URL strings that E-Societ used that were functional in those systems. As to configuring, the patent discloses a setup process where the merchant and source system exchange information so that a URL can be functional in the system for tracking. And I noted earlier that there were admissions by EPIC that this occurred. EPIC disagrees. The admissions were, with respect to the hybrid string, that EPIC's chief information officer, Richard Okun, said that EPIC transmitted to merchants a code identifying EPIC itself. And, as the district court found in nobody disputes, EPIC also transmitted the source webmaster identification code to the merchants. Those two pieces of information put together, the piece of information, the first portion identifying EPIC, the second piece identifying the SID, that is the hybrid string discussed in the patent at column 11, lines 15-20. So that's the configuration and those are the admissions. EPIC contended it didn't practice the hybrid string. The evidence shows otherwise, but we don't have to prove our case here, nor did we at summary judgment. E-Societ merely had to show that there was a material fact and the case should proceed to trial. And so based upon the evidence that I've cited here, the court should have denied summary judgment and should have allowed a jury to review this evidence to consider whether the long string of characters, as EPIC describes it in this argument, was an identifier for EPIC plus an affiliate identifier, there being the hybrid string and that being infringement. And so where the district court erred is accepting EPIC's evidence as being true. And disregarding E-Societ's evidence and granting summary judgment when the evidence should have been put before a jury so a jury could conclude that there was infringement or that there wasn't. But in any event, summary judgment should not have been granted and this court should reverse and remand so that the case can proceed to trial. Thank you. Thank you, Mr. Newman. We will take the case on revival. All rise.